**UNITED STATES of America**

v.

**Alfredo DeJESUS.**

**No. 95–CR–408–2.**

United States District Court,
E.D. Pennsylvania.

Dec. 20, 1995.

Wendy Kelly, Asst. U.S. Atty., for U.S.

James A. Lammendola, Philadelphia, PA, for DeJesus.

## MEMORANDUM OF DECISION

ANITA B. BRODY, District Judge.

On December 7, 1995, after consideration of the defendant's motion to suppress evidence, the government's response, an evidentiary hearing on the matter, and subsequent submissions by counsel for the government and the defendant, I issued an order denying the motion. This Memorandum of Decision makes findings of fact and conclusions of law with respect to the order and discusses the conclusions of law.

The defendant moved to suppress the following: his warrantless arrest; the warrantless searches of the van he allegedly carjacked; his written and/or oral statements; and Father Mark Shinn's identification of him.

## I. FINDINGS OF FACTS

The parties have stipulated to many of the facts underlying the motion. I adopt their stipulations and incorporate them as findings of fact 1 through 20.[1]

1. The stipulated facts were numbered paragraphs 1–20, but there were actually 21 stipula- tions, two paragraphs having been numbered

1. At approximately 11:00 p.m. on July 6, 1995, the Camden 911 Operations Center received a telephone call from James McDermott. Mr. McDermott related that he had a man in his home who had been shot. Consequently, police officers responded to Mr. McDermott's residence at 2947 Adams Avenue, in Camden. While en route, they were advised by radio that the victim was a priest, and the victim's 1986 Dodge Ram van was described, including the license plate number.

2. Once police arrived, they spoke to the victim, Father Mark Shinn, and obtained information regarding Father Shinn's carjacking, kidnapping, and shooting. He related that he could not identify his assailants, other than that they were three or four hispanic males. As part of the information received, they were told that the men were armed, and Father Shinn again gave a description of his van, which the perpetrators had stolen, including the Pennsylvania license plate number. While Father Shinn related this information to police, Emergency Medical Technician Christopher Williams was present.

3. After giving the information to the police, Mr. Williams transported Father Shinn to Cooper Medical Center in Camden for treatment. Police put out an "all points bulletin" on police radios for the van.

4. After transporting Father Shinn to Cooper, Mr. Williams and his partner, Shawn Vena, continued on their duties. Sometime before midnight, Williams and Vena saw the van described by Father Shinn earlier that evening, driving down the street. He then notified Camden police, via a portable radio, that he had the stolen van in sight, and was following it in his ambulance.

5. Williams followed the van until he saw it pull over in the vicinity of 9th and Atlantic Streets, near Betty's Lounge, a bar. He saw three individuals in the van, but could not see their faces. He then reported over the radio that the van had stopped.

6. Soon thereafter, Camden police arrived and arrested the individuals who were either in the van, or immediately outside the

van at about 11:40 p.m. on July 6, 1995. This arrest was accomplished without a warrant.

6A. The three individuals were identified as Jose Casiano, also known as Jose Rivera, Alfredo DeJesus, and J.C., a juvenile. All three were searched at the time of arrest for weapons and contraband. A GMBH .38 caliber revolver loaded with 6 hollow point rounds was found on defendant Casiano. The search of the suspects was accomplished without warrants.

7. The van was searched at the arrest scene, without a warrant, immediately after the suspects were placed in custody. Police found a Jennings Firearms .380 caliber semiautomatic pistol, a Davis Industries .380 caliber semi-automatic pistol, a total of 13 live .380 rounds of ammunition, a sawed-off shotgun, and a rubber 2–sided mask of "Batman" and "the Joker" in the van. The van was then taken into custody by the Camden Police, and impounded.

8. Father Shinn gave an oral statement to the Camden Police at the time they responded to the 911 call. While being treated at Cooper Medical Center, he told a Camden Police officer that he did not believe that he could identify his attackers.

9. Father Shinn testified that he was never shown a photo array of suspects, a line-up, or a show-up by any law enforcement officers.

10. On July 8, 1995, Father Shinn saw a newspaper article about his carjacking, kidnapping, and shooting on July 6th. Accompanying the article were two photographs of the two suspects; one of defendant DeJesus, another of defendant Casiano/Rivera. The photographs were arrest photographs provided to the newspaper by the Camden Police Department.

11. Father Shinn has stated that he recognized the photograph of DeJesus as one of the individuals who had abducted him, and so informed Special Agent Walsh during an interview on July 13, 1995. He has stated that he did not recognize defendant Casiano from the photograph.

"6". I renumbered the second paragraph "6" as "6A".

12. Father Shinn is nearsighted, and wears glasses, but he was wearing his glasses at the time he was carjacked on July 6, 1995. There was an overhead street light located across the street from where Father Shinn parked his van on July 6, 1995, which provided illumination at the time he was attacked. The assailant who struck Father Shinn over the head came within inches of the side of his face, and Father Shinn got a view of the assailant for several seconds. The assailant had his back to the street light.

13. On July 13, 1995, Special Agent James Walsh of the Federal Bureau of Investigation ("FBI"), went to the Camden Police impound lot, and recovered one pair of prescription eyeglasses and a wool blanket from the van. Agent Walsh also photographed the van. This was done without a warrant.

14. On July 20, 1995, Agent Walsh again went to the van at the impound lot. This time he fingerprinted the van, and took a pack of Newport cigarettes, a plastic floor mat with red stains, and three pieces of clothing. This was done without a warrant.

15. After his arrest at about 11:40 p.m., on July 6, 1995, defendant Alfredo DeJesus remained in custody. At approximately 3:45 a.m. on July 7, 1995, he was read his *Miranda* rights by Detective Richard Desmond, which he waived. When questioned, he maintained that he "didn't know" anything, and told police to "do what you have to do". After about 30 minutes, the interview was terminated by police. He did not request counsel, nor did he state that he wanted to remain silent. When Detective Desmond advised defendant DeJesus of his rights, he specified that DeJesus was being read his rights for weapons offenses, conspiracy, and aggravated assault, not for carjacking and kidnapping.

16. DeJesus was in the custody of Camden, NJ authorities until July 24, 1995. Detective Desmond testified that normally suspects arrested in Camden are brought before a Magistrate within about 2 days, but that it would take no more than a week for a defendant to appear before a Magistrate.

17. On July 11, 1995, defendant DeJesus was interviewed, by Special Agents Paul Murray, James Smith, and Delia Kane, who acted as a Spanish interpreter. He was read his *Miranda* rights, and waived those rights, confessing to his involvement in the carjacking, kidnapping, and shooting of Father Shinn. This interview took place at the FBI office in Cherry Hill, New Jersey. Although the defendant was informed of his *Miranda* Rights, he was not informed of any specific charges against him.

18. At some point between July 7, 1995 and July 11, 1995, Special Agent James Walsh of the FBI notified Camden authorities that the federal government planned to assume jurisdiction over the case.

19. On July 20, 1995, a federal complaint and arrest warrant was issued by United States Magistrate Judge Thomas Rueter.

20. The defendants were brought in under the control of the FBI on July 24, 1995, pursuant to the federal complaint and warrant, and appeared that same morning before a United States Magistrate Judge in Camden, New Jersey. At that time, defendants were provided counsel for purposes of the removal, and were ordered removed to the Eastern District of Pennsylvania. They had their initial appearance before a United States Magistrate Judge on that date, and defendant DeJesus was appointed counsel.

In addition to the facts listed above, to which the parties have stipulated, I make the following findings of fact:

21. At approximately 10:00 p.m. on July 6, 1995 near his home in Philadelphia, Father Shinn opened the door of his own van and was beginning to get out when someone hit him in the head. He turned and saw the person "face-to-face," "in a flash." That person was the only one of his assailants whose face he saw.

22. After the incident, Father Shinn thought he could not recognize the face of his initial assailant, because it had happened so quickly and there was so much trauma and confusion afterwards. However, on July 8, when he saw photographs in the newspaper of the two adults who had been arrested, he was surprised to find he recognized one of them, the defendant, as his initial attacker. He did not recognize the other one. He

testified before a Grand Jury on August 3, 1995, that one of the photographs looked very much like the face he had seen for a few seconds during the incident. At the suppression hearing, Father Shinn was "quite certain" the person in the photograph was one of his assailants.

23. Father Shinn is a very credible witness, thoughtful and precise.

24. Father Shinn was never shown a photo array of suspects, a line-up, or a show-up by any law enforcement officers.

25. Father Shinn recognized the photograph of DeJesus as one of the individuals who had abducted him, and so informed Special Agent Walsh during an interview on July 13, 1995. He did not recognize defendant Casiano from the photograph.

26. There is no evidence that the defendant was subject to duress during the time he was held in custody. There is no evidence that he was questioned between the first interrogation, the night he was arrested, and the interrogation at which he confessed. There is no evidence that the confession was coerced.

27. There is no evidence of collusion between state and federal authorities to keep the defendant in custody without bringing him before a magistrate. The defendant was arrested shortly before midnight on Thursday, July 6, and confessed to federal authorities shortly before noon on Tuesday, July 11, some four and one-half days later. As Detective Desmond testified, it is not the procedure in New Jersey to take those arrested before a magistrate at once. Unless they are released on bail or a summons, they are remanded to the county jail. Then, they are taken before a magistrate within the week, and normally within two days. Before that week was out, the defendant had confessed.

28. On July 24, 1995, the defendant was arrested on federal charges and brought before a federal magistrate for arraignment.

29. When Camden Police seized the van and when they searched it, they were informed that the owner of the van was Father Shinn and that the van had been stolen.

30. The first interview of the defendant, at approximately 3:45 a.m. on July 7, 1995, by the Camden police, was conducted entirely in English, including the *Miranda* warnings. As Detective Desmond testified, the defendant did not appear to have any difficulty understanding his questions. The defendant did not request a Spanish interpreter.

31. As indicated by the notes of the second interview, that by FBI agents on July 11, 1995, the defendant was asked if he could understand and speak English. He replied that he could understand English but sometimes was unable to answer questions without using the Spanish language. As Special Agent Delia Kane testified: she is fluent in Spanish and assisted during the July 11 interview; the defendant was read his *Miranda* rights in both Spanish and English; when Agent Murray asked questions in English, she translated the questions into Spanish to be sure the defendant understood them; and the defendant answered sometimes in English and sometimes in Spanish.

32. The defendant was given *Miranda* warnings before both interrogations, indicated that he understood them on both occasions, and waived his right to remain silent and his right to counsel on both occasions.

33. As Detective Desmond testified, the Emergency Medical Technicians told police by radio that the suspect van had several males in it. As he further testified, the suspects were in the van when arrested.

## II. DISCUSSION

### A. *Suppression of Physical Evidence*

#### 1. Warrantless Arrest

■ Defense counsel argues that all evidence seized as a result of the defendant's warrantless arrest should be suppressed because the arrest was effected without probable cause.

Police are permitted to arrest suspects without an arrest warrant for felonies, so long as there is probable cause for the arrest. *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975); *U.S. v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976).

There was ample probable cause to make a warrantless arrest. Father Shinn was assaulted exiting his own van near his home in Philadelphia, Pennsylvania at approximately 10:00 p.m. on July 6, 1995, and he was then forcibly taken in his van to Camden, New Jersey and was held there until he was forcibly removed from the van less than hour later and was shot. Father Shinn provided detailed information to the Camden Police at approximately 11:00 p.m. on July 6, 1995, information which included a description of the van, the license plate number, a description of the assailants as three or four hispanic males, and the fact that there were firearms involved. The emergency medical technician who took Father Shinn to the hospital heard Father Shinn describe the van to the police. The technician later saw the van and followed it in his ambulance while he notified Camden Police via portable radio. Shortly thereafter, the police arrived and apprehended the defendant and two others, all in the van, at approximately 11:45 p.m. The license plate number matched that reported by Father Shinn, and the suspects were three hispanic males. One had a firearm on his person at the time of arrest. Based upon these facts, ample probable cause existed for the officers to make a warrantless arrest.

### 2. Warrantless Searches of the Van

■ Defense counsel argues that all evidence seized from the van should be suppressed because the initial search was done without a warrant and without probable cause, and later searches were done without warrants and without the proper police procedures. He asserts a possessory interest in the contents of Father Shinn's van and seeks to have the evidence of guns, fingerprints, DNA evidence, ski masks, and ammunition taken from the van suppressed as the fruits of an illegal search.

■ The Supreme Court has held that defendants "may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *U.S. v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980) (overruling *Jones v. U.S.*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), which gave those charged with possession "automatic standing" to challenge legality of a search). In *Salvucci*, the Court "decline[d] to use possession of a seized good as substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." 448 U.S. at 92, 100 S.Ct. at 2553. A person in possession of a stolen vehicle does not have standing with respect to its search and the seizure of its contents because he does not have a legitimate expectation of privacy with respect to the vehicle. *See U.S. v. Kucinich*, 404 F.2d 262, 266 (6th Cir.1968) (defendants lacked standing to challenge later search of stolen automobile because police held it as agents of owner, not of defendants). Similarly, the defendant in this case has no legitimate expectation of privacy and no standing to challenge the searches of Father Shinn's van.

The defendant relies on *United States v. Salmon*, 944 F.2d 1106 (3d Cir.1991), in which the court held that a warrantless inventory search of a legitimately seized vehicle was invalid because there was no evidence of any criteria or established routine regarding the scope of an inventory search. *Id.* at 1121. However, in *Salmon*, the person aggrieved by the unlawful search was the owner of the vehicle seized, not its alleged thief; he therefore had a legitimate expectation of privacy in its contents. As the court stated,

> The requirement that inventory searches be conducted according to such criteria or routine strikes a balance between the government's legitimate interests in such searches and the owner's legitimate expectation of privacy in the contents of the seized vehicle.

*Id.* at 1120 (footnotes omitted).[2]

■ The defendant in this case does not claim ownership or a possessory interest in the van; he therefore has no legitimate expectation of privacy in its contents. He can

2. In one of the footnotes to this passage, the court explained that an inventory search served " 'to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.' " *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990)).

claim no interest to balance against "the government's legitimate interest in such searches." *Id.* His own Fourth Amendment rights have not been violated, and he has no standing to challenge the an inventory search or any other search of the van.[3]

## B. *Suppression of Written and/or Oral Statements*

The defendant argues that his oral statements to the Camden Police on July 7, 1995, and to the FBI on July 11, 1995, should be suppressed for a number of reasons: undue delay in bringing him before a magistrate; improper *Miranda* Warnings; the fact that he did not knowingly, intelligently, and voluntarily waive his rights; the fact that his statements were the result of an arrest effectuated without probable cause; and the fact that he was only told of state charges of aggravated assault and weapons offenses and not of the federal charges of carjacking and kidnapping before making the statements he wishes to suppress.

▆▆▆ The touchstone for the admissibility of a confession is voluntariness. Title 18 United States Code, Section 3501(a) provides: "In any criminal prosecution brought by the United States ..., a confession ... shall be admissible in evidence if it is voluntarily given." It states that the trial judge, in determining voluntariness, shall take into account all the circumstances surrounding the confession, including:

(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment;

(2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession;

(3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him;

(4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and

(5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b). The sub-section goes on to say that the presence or absence of any of these factors need not be conclusive on the issue of the voluntariness of the confession. *Id.* The factors will be considered in turn.

### (1) *Time elapsing between arrest and arraignment.*

The defendant argues that the delay between arrest and arraignment rendered the confession inadmissible under 18 U.S.C. § 3501. He is referring to his arrest on state charges the night of July 6, 1995, and his arraignment on federal charges on July 24, 1995, a span of 18 days. There was no appreciable delay between his arrest on federal charges and his arraignment; both occurred on the morning of July 24, 1995. The defendant was never arraigned or prosecuted on the state charges. The confession occurred on July 11, 1995, when the defendant was in state custody.

In *U.S. v. Alvarez–Sanchez,* —— U.S. ——, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994), the Supreme Court considered the effect of the delay between arrest and arraignment on the voluntariness of a confession made to federal authorities while the defendant was in state custody. Pedro Alvarez–Sanchez was arrested in California on state narcotics charges.

---

**3.** Even if the defendant did have standing to challenge the warrantless searches of the van, he would not succeed with respect to the initial search. The initial warrantless search was undertaken pursuant to a warrantless arrest for which, as discussed above, there was probable cause. No warrant is required under the Fourth Amendment to search a vehicle incident to a lawful arrest, *N.Y. v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981), and in this case, the defendant's arrest was lawful. In addition, no warrant is needed if police have

probable cause to believe that the vehicle contains contraband or evidence of criminal activity. *Arkansas v. Sanders,* 442 U.S. 753, 760, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979). Because of Father Shinn's account of the incident, the police had ample probable cause to believe the stolen van contained evidence of the carjacking and kidnapping, and possibly additional firearms. When the van was searched at the scene of the arrest, immediately after the three suspects were placed in custody, three firearms were located, in addition to other items.

Three days later, while he was still in state custody, he confessed to United States Secret Service agents that he knew the Federal Reserve Notes the local police officers found while searching his home were counterfeit. The federal agents arrested him for possessing counterfeit currency and he was arraigned before a federal magistrate the following day. He was never arraigned or prosecuted on the state drug charges.

Alvarez–Sanchez argued that the delay of four days between his arrest on state charges and his presentment on the federal charge rendered his confession inadmissible under 18 U.S.C. § 3501(c), which states that a confession

> shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States ... if such confession was made or given by such person within six hours immediately following his arrest or other detention.

18 U.S.C. § 3501(c). The defendant argued that, by negative implication, a confession made more than six hours after arrest had to be suppressed. *Alvarez–Sanchez,* —— U.S. at ——, 114 S.Ct. at 1603. The Supreme Court held that

> there can be no "delay" in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place. Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense. Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under § 3501(c) can occur.

*Id.* at ——, 114 S.Ct. at 1604 (citation and footnote omitted).

The Court noted a possible exception to this rule: if state or local authorities, acting in collusion with federal officers, arrested and detained a suspect in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment, a confession so obtained would have to be suppressed. *Id.* However, in *Alvarez–Sanchez,* the district court had found there was evidence of nothing more than routine cooperation between local and federal authorities, and the Supreme Court saw no reason to disturb that finding. *Id.* at ——, 114 S.Ct. at 1605.

The facts in the present case are substantially similar to those in *Alvarez–Sanchez.* The defendant was arrested on state charges on July 6, 1995, at about 11:40 p.m., but was never arraigned or prosecuted on those charges. At approximately 3:45 a.m. on July 7, 1995, he was read his *Miranda* rights, waived them, and was questioned by state police, but he was unresponsive to questioning and the interview was terminated by the police. He was questioned by federal agents on July 11, 1995, waived his *Miranda* rights, and confessed. He was arrested and arraigned on federal charges the morning of July 24, 1995.

There is no evidence that the failure of Camden police authorities to arraign the defendant before he made the statements he seeks to suppress was the result of collusion between local and federal authorities to interrogate the defendant in violation of his right to a prompt federal presentment. Nor is there evidence that the defendant was interrogated, coerced or subject to duress during the time he was held in custody between the initial interrogation by the Camden police and that by the FBI. Instead, the evidence is that the failure to arraign the defendant sooner was a matter of routine police procedure. Detective Desmond testified that while normally suspects arrested in Camden are arraigned within about 2 days, it might take as long as a week. In this case, the four and one-half days between arrest and the confession spanned a week-end. The defendant was being held in state custody on state charges when he confessed and, as in *Alvarez–Sanchez,* the confession was not invalidated by the fact that he was not arraigned sooner because the federal authorities had no duty to arraign him until they had arrested him.

The nearly two weeks the defendant was held in state custody without arraignment after his confession on July 11, 1995, was not a matter of routine state police procedure, nor is it excusable. However, there was no evidence of collusion between state and federal authorities to keep the defendant in state custody pending federal charges. Moreover, the purpose of that delay cannot have been to interrogate the defendant in violation of the defendant's rights; the interrogation and confession had already occurred, and there was no evidence of further interrogation after the confession.

 While the state's continuing custody of the defendant without arraignment *after* he confessed certainly seems to have been undue, there is no logical way that the failure of federal or state authorities to arraign the defendant promptly after he confessed could have had any impact on the voluntariness of the confession, which occurred before the undue delay. *See U.S. v. Rojas–Martinez,* 968 F.2d 415, 418 (5th Cir.1992), *cert. denied,* 506 U.S. 1039, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992) and 113 S.Ct. 995 (1993) (since delay occurred after confessions, it could not have affected voluntariness). The delay in this case does not fall under the exception mentioned in *Alvarez–Sanchez* of collusion to delay and it does not invalidate the confession as involuntary.

(2) *Whether the defendant knew the nature of the offense* with which he was charged or of which he was suspected at the time of making the confession. The parties stipulate that the defendant was arrested on state charges of aggravated assault and weapons offenses. At the time of his confession, he was not told that he was suspected of the federal crimes of carjacking and kidnapping; however, there was no uncertainty or confusion as to the incident about which the defendant was being questioned. A defendant need not be advised of the specific statute he is suspected of violating before he confesses. *U.S. v. Andaverde,* 64 F.3d 1305, 1311 (9th Cir.1995); *U.S. v. Williams,* 616 F.2d 759, 761 (5th Cir.), *cert. denied,* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980); *United States v. Thigpen,* Nos. 93–50043, 93–50058, and 93–50067, 1994 WL 59791 at *6 (9th

Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 1571, 128 L.Ed.2d 215 (1994) and —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 309 (1994). In this case, the defendant clearly knew that his abduction of Father Shinn and appropriation of Father Shinn's van were grave wrongs, and he confessed upon being questioned about them. While he was not informed of a precise statute under which charges might be brought, there is no merit in the argument that the defendant did not know the nature of the offenses to which he was confessing.

(3) and (4) *Whether the defendant was properly advised of his Miranda rights.* The government testimony and exhibits demonstrated that the defendant was properly advised of his *Miranda* rights. The *Miranda* warnings at the first interrogation, in the early morning of July 7, 1995, were given in English and not in Spanish, but the defendant understood English. He waived his *Miranda* rights and responded in English. His responses were minimal and he did not give any useful information. At the second interrogation, on January 11, 1995, at which the defendant confessed, the FBI's notes of the interview show the defendant stating that he understood English, but that he sometimes was unable to answer questions in English. The *Miranda* warnings were given in both Spanish and English and the entire interview was conducted in both languages, with one of the federal agents acting as interpreter. The defendant was properly given his *Miranda* warnings before both interrogations, he understood the *Miranda* warnings both times they were given, and he waived his right to remain silent and his right to counsel on both occasions.

(5) *Whether the defendant was without the assistance of counsel* when questioned and when giving such confession. The defendant was without the assistance of counsel when he was questioned and when he confessed; however, he waived the right to counsel on two occasions and there is no evidence that he requested counsel at any other time while he was in custody. The fact that he was without counsel when he confessed weighs on the side of involuntariness, but it does not overcome the other factors favoring volun-

tariness. I therefore conclude that, considering the totality of the circumstances affecting voluntariness, the defendant's confession was voluntary and therefore admissible.

### C. *Suppression of Identification by Father Shinn*

The defendant contends that Father Shinn's identification of him must be suppressed as unreliable. In the context of eyewitness identification testimony, "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) and "[i]t is the likelihood of misidentification which violates a defendant's right to due process". *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 380–381, 34 L.Ed.2d 401 (1972). The Court in *Biggers* and *Manson* enunciated five factors for courts to consider in evaluating the reliability of the eyewitness's identification testimony: (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness' degree of attention at the time of the crime; (3) the accuracy of the witness' description of the defendant; (4) the witness' level of certainty when identifying the defendant at confrontation; and (5) the length of time elapsed between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–383; *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. Against these factors must be weighed the corrupting effect of suggestive identification. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253.

The defendant contends that Father Shinn's identification of him should be suppressed because the newspaper photograph was impermissibly suggestive. The inquiry I must make in the case of an out-of-court identification is "whether the challenged procedures created 'a very substantial likelihood of misidentification.'" *U.S. v. Milhollan*, 599 F.2d 518, 522 (3d Cir.1978), *cert. denied*, 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979) (citing *Biggers*, 409 U.S. at 198, 93 S.Ct. at 381).

The totality of the circumstances in this case, considered in light of the factors enumerated in *Biggers* and *Manson*, does not create a very substantial likelihood of misidentification. Father Shinn testified that he saw the face of his initial attacker "in a flash," when he turned to see what had hit him. For that moment, the two were "face-to-face." Father Shinn, who is nearsighted, was wearing his glasses at the time. The light came from above and behind the attacked, from an overhead street light across the street. The lighting and the circumstances provided an opportunity for Father Shinn to view his attacker that, while not ideal, was adequate for later recognition. Father Shinn's attention was focused on the attacker, who had just struck him; this was not a casual observation by an uninvolved witness. Father Shinn could provide no description of any of his assailants when questioned just after the incident. He was aware that he had seen his initial attacker, but thought that he had lost the image of that face in the trauma and confusion of the subsequent events. When he saw the photographs in the newspaper article, a day and a half later, he was surprised to find he recognized one of the men as his assailant. At the suppression hearing on November 3, 1995, Father Shinn was "quite certain" that one of the two photographs in the newspaper was that of his attacker, but he had no recognition of the other photograph. His initial attacker was the only one of his assailants whose face he had seen. Between the time of the incident and the suppression hearing, some four months later, Father Shinn did not see the defendant, nor had he been shown any photographs by law enforcement authorities.

To summarize: Father Shinn's opportunity to observe the defendant at the time of the crime was adequate; his attention appears to have been focused on the face of the attacker, if only for a moment; and he was quite certain of the identification. In the confusion and trauma that followed the attack, his belief that he could not recognize any of his attackers is understandable. The newspaper photograph jogged his memory, and his ability to recognize only one of the two photographs lends credibility to his account. The photographs in the newspaper of two men suspected in his kidnapping and carjacking were suggestive, but given the totality of the

circumstances, I do not find they were unduly suggestive. I conclude that Father Shinn's identification of the defendant does not create "a very substantial likelihood of misidentification," and therefore should not be suppressed.

## III. CONCLUSIONS OF LAW

1. Probable cause existed for the police to make a warrantless arrest of the defendant.

2. The defendant has no standing to challenge searches of the van.

3. Given the totality of the circumstances, the defendant's confession was made voluntarily and should be admitted in evidence.

4. Given the totality of the circumstances, Father Shinn's identification of the defendant is reliable and should be admitted in evidence.

For reasons stated above, the defendant's motion to suppress was denied in its entirety.