UNITED STATES of America,

v.

Usama Bin LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mba-

rak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7)98CR.1023(LBS).

United States District Court,
S.D. New York.

Feb. 16, 2001.

See, also, 132 F.Supp.2d 168.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Patrick J. Fitzgerald, Kenneth M. Karas, Paul W. Butler, Andrew C. McCarthy, Assistant United States Attorneys, for U.S.

Frederick H. Cohn, Laura Gasiorowski, David Preston Baugh, New York City, for Defendant Al-'Owhali.

David A. Ruhnke, Jeremy Schneider, David Stern, New York City, for Defendant Khalfan Khamis Mohamed.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York City, for Defendant El Hage.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, New York City, for Defendant Odeh.

## OPINION [1]

SAND, District Judge.

Presently before the Court are motions submitted on behalf of Defendants Mohamed Sadeek Odeh and Mohamed Rashed Daoud Al-'Owhali. Odeh seeks suppression of statements that he made to Pakistani officials while he was detained in Pakistan (and the fruits of those statements), and suppression of statements that he made to American officials while he was detained in Kenya. He claims that suppression is warranted on several alternative grounds, including: that he was detained for an unreasonable length of time before being brought before a magistrate; that the statements made in Pakistan were involuntary; that the Kenyan statements were obtained in violation of *Miranda;* and that he was never apprised of his right to consular notification under the Vienna Convention. The Court also addresses, in this Opinion, Defendant Mohamed Rashed Daoud Al-'Owhali's motion to suppress his confession on the ground that he was detained for fourteen days before being brought before a magistrate.[2] For the reasons set forth below, these motions are denied.

1. This Opinion is being filed initially under seal. It will be unsealed on February 16, 2001 unless the Court is advised in writing on or before that date that there is good reason why it should remain under seal. Classified Appendix A will continue to be under seal until the Court is advised by the Government that some portion or all of the Appendix may be unsealed.

2. We address the remainder of Al-'Owhali's suppression motions in a sealed Opinion also filed today.

## I. PROCEDURAL HISTORY

On June 20, 2000, Defendant Odeh filed a motion seeking the suppression of: (1) statements he made in Pakistan during interrogation by Pakistani law enforcement; (2) statements he made in Kenya during interrogation by U.S. law enforcement; and (3) evidence seized during a search of his residence in Witu, Kenya. This three-part motion was based, inter alia, on Odeh's sworn affidavit. Subsequently, at a sealed and ex parte hearing held on August 1, 2000, it became clear that Odeh wished to withdraw his affidavit on grounds relating to his religious beliefs;[3] the Court found such action to be fully within Odeh's discretion. (Tr. Aug. 1, 2000 Sealed, Ex Parte Hr'g at 4, 20.) The withdrawal of Odeh's affidavit then prompted the Court to deem as similarly withdrawn the motion to suppress itself, but leave was granted for Odeh's counsel to renew the suppression motion in a way that did not rely on Odeh's own affidavit.[4] (*Id.* at 14.) We stated that our determination as to the legal sufficiency of any such motion would occur only after the renewed motion was actually filed and the Government had an opportunity to respond. (*Id.* at 14–15.) In any event, lead counsel for Odeh took the position—not imposed by the Court—that he and co-counsel would make no filings, in any format, without the prior approval of their client. (*Id.* at 13.) We reiterated the above understandings to counsel for Odeh in an ex parte court proceeding held on September 28, 2000. (*United States v. Bin Laden,* 98 Cr. 1023(LBS), "Excerpt from Proceeding Held Sept. 28, 2000 Ex Parte on Application of Sandra A. Babcock, Esq. to Withdraw as Counsel.")

During the five months between August 1, 2000 and the start of jury selection on January 3, 2001, no renewed motion to suppress was ever filed on behalf of Odeh. On January 9, however, the Court granted Defendant Al-'Owhali's motion to suppress statements made by him in Kenya during interrogation by U.S. law enforcement.[5] Odeh thereafter filed two suppression motions directly on the heels of the favorable Al-'Owhali ruling: (1) a January 10 motion to suppress statements Odeh made in Kenya, and (2) a January 18 motion to suppress statements Odeh made in Pakistan and the fruits thereof. Both motions simply renewed arguments raised in Odeh's previously withdrawn motion to suppress. Both also relied upon sworn affidavits executed by Odeh; in his own words, a review of Al-'Owhali's successful suppression motion left him "convinced that these limited issues can be raised without running afoul of my deeply held religious beliefs." (Odeh Aff. in Support of Mot. to Suppress Kenyan Statements ¶ 11; Odeh Aff. in Support of Mot. to Suppress Pakistani Statements ¶ 10.)

On January 19, 2001, we concluded that an evidentiary hearing should be held as to the admissibility of statements made by Odeh while interrogated in Kenya—i.e., his January 10 motion. (Tr. Jan. 19, 2001 Sealed Hr'g at 27–28.) That hearing was to be consolidated with an upcoming hearing, already scheduled to begin on January 23, concerning Al-'Owhali's reopened suppression motion.[6] In our mind, the motions of these two defendants raised facts and issues that were intertwined. The combined hearing was held on January 23, and the motion concerning Odeh's Kenyan

---

3.  Odeh had previously expressed his concerns as to this matter in letters addressed separately to the Court (July 9, 2000) and the Government (July 18, 2000).

4.  At the August 1 hearing, Odeh indicated that there was some possibility that he would permit a suppression motion to be made if it did not require his active participation. (Tr. Aug. 1, 2000 Sealed, Ex Parte Hr'g at 10–12.)

5.  We later withdrew this decision after the Government moved for reconsideration. A reopened hearing as to Al-'Owhali's suppression motion was held on January 23, 2001. Our ruling as to that reopened motion is contained in a sealed opinion also filed today.

6.  *See, supra,* note 5 and accompanying text.

statements became fully submitted at the close of business on January 26. We address the merits of Odeh's January 10 motion herein.

Our treatment of Odeh's January 18 motion has been altogether different. Based on the Government's representation "that it does not intend to offer for its case in chief at trial any statements made by Odeh to Pakistani officials" (Gov't Sept. 18, 2000 Ltr. to the Court), Odeh sought to preclude the Government from using his Pakistan statements for the narrow purposes of impeachment or rebuttal. We tentatively opined that resolution of this aspect of the motion should at least be deferred until such time as the Government actually seeks to impeach or rebut a defense witness through the use of statements made by Odeh to Pakistani officials. (Tr. Jan. 19, 2001 Sealed Hr'g at 28–29.) As for suppression of the fruits of Odeh's Pakistan statements, the Court made no preliminary ruling except that the Government would be allowed to argue the untimeliness of Odeh's January 18 motion to suppress. (*Id.* at 27.) In a written submission dated January 23, 2001, the Government did in fact raise the timeliness issue. (Gov't Jan. 23, 2001 Ltr. to the Court at 3–6.)

## II. FINDINGS OF FACT [7]

At the reopened suppression hearing which was held on January 23, the only witness testimony which related to Defendant Odeh's motion was that of Assistant

United States Attorney (AUSA) [redacted], who participated in Odeh's interrogation in Kenya. The Court's findings of fact are based on the testimony of AUSA [redacted] and on the numerous documents and affidavits submitted by the parties, including but not limited to reports from the Kenyan Criminal Investigation Division (CID) and the FBI.[8]

### Arrest in Pakistan

1. On the morning of August 7, 1998, Defendant Odeh was detained by Pakistani immigration authorities in the airport in Karachi, Pakistan after arriving on a flight from Kenya. The basis for Odeh's detention by Pakistani authorities was his alleged use of a false passport.

2. Odeh was in the exclusive custody of Pakistan from August 7—August 14, 1998 and was interrogated by Pakistani officials during this time.

3. On August 14, 1998, Odeh was transported from Karachi, Pakistan to Nairobi, Kenya and delivered into the custody of Kenyan officials. Much of the information regarding the circumstances of Odeh's return to Kenya is classified. Therefore, the Court includes additional findings of fact in classified Appendix A to this Opinion.

### Odeh's Detention and Interrogation in Kenya

4. Upon arrival in Kenya at Jomo Kenyatta Airport on August 14, 1998 at

---

7. The Court's assessment, in this Opinion, of Defendant Al-'Owhali's presentment claim is based on findings of fact which are enumerated in a separate sealed opinion also filed today and on information contained in Classified Appendix A to this Opinion.

8. We also rely on AUSA [redacted]'s January 23, 2001 affidavit and the attached exhibits, which we admit as evidence with the following exceptions: paragraphs 19 and 20. These two paragraphs are in the nature of legal argument and are thus not evidence. Also, because the affidavit is admitted into evidence only for purposes of a suppression hearing, all of Odeh's objections based on hearsay are

rejected. *See* Fed.R.Evid. 104(a) (court not bound by rules of evidence in preliminary proceedings concerning admissibility of evidence, except for issues of privilege); Fed. R.Evid. 1101(d)(1) (evidence rules inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104"); *see also United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence even though that evidence would not be admissible at trial.").

7:30 p.m., Odeh was delivered into the custody of a Kenyan CID officer. That officer took Odeh directly to CID Headquarters.

5. CID officials took possession of the personal belongings that the Defendant had with him at the time, including a passport in the name of Adulbasit Awadh, a used airline ticket, Kenyan and United States currency totaling approximately $560, a wristwatch, and a bag containing clothes, books and toiletries.

6. The interrogation of Odeh in Kenya, which commenced on the morning of August 15, 1998 at approximately 10:00 a.m., was conducted entirely in English. Odeh informed the American officials that he was comfortable speaking English and that he would ask questions if he had difficulty understanding.

7. FBI Special Agent (S.A.) John Anticev conducted the interview in the presence of another FBI agent, Tim O'Neill, Assistant United States Attorney [redacted], and three Kenyan CID officers. The majority of the questions put to Defendant Odeh were posed by the American officials.

8. At the outset of the interrogation, Odeh was informed that even if he had confessed to Pakistani officials, he did not have to speak to the Americans. Thereafter, when Odeh raised the issue of his admissions to the Pakistani authorities, he was told that the Americans did not know or care about what had transpired in Pakistan.

9. Before any questions were asked of Defendant Odeh, S.A. Anticev read him the following Advice of Rights (AOR) in English:

We are representatives of the United States Government. Under our laws, you have certain rights. Before we ask you any questions, we want to be sure that you understand those rights.

You do not have to speak to us or answer any questions. Even if you have already spoken to the Pakistani authorities, you do not have to speak to us now.

If you do speak with us, anything that you say may be used against you in a court in the United States or elsewhere.

In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.

Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.

If you decide to speak with us now, without a lawyer present, you will still have the right to stop answering questions at any time.

You should also understand that if you decide not to speak with us, that fact cannot be used as evidence against you in a court in the United States.

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

10. S.A. Anticev then presented the AOR form to Odeh for him to sign. (The same form had been presented to Defendant Al-'Owhali, who was also in Kenyan custody, on August 12, 1998 and would be presented to Defendant K.K. Mohamed in South Africa the following year, on October 5, 1999.)

11. At some point during S.A. Anticev's reading of the AOR, Odeh inquired about the availability of a Kenyan attorney but he did not specifically request an attorney. Odeh's question

was not immediately answered because S.A. Anticev began answering a second question that had been posed by the Defendant.

12. S.A. Anticev then proceeded to continue reading the form. After a brief conversation about Defendant Odeh's desire to speak with the agents without signing the form, the interview was suspended while AUSA [redacted] sought an answer to Odeh's inquiry about the availability of Kenyan counsel. No substantive questions had been asked of the Defendant at this point.

13. AUSA [redacted] testified that he assumed that Odeh was interested in the availability of appointed Kenyan counsel. At the time, he did not believe that Defendant Odeh had the resources to retain his own attorney.[9]

14. A high-ranking Kenyan CID official told AUSA [redacted] that Kenyan law did not provide for appointed counsel at the investigative stage and that it was CID practice to continue questioning a person who requests an appointed attorney. This information was conveyed to Odeh and AUSA [redacted] confirmed that Odeh did not already have a retained attorney.

15. There is no indication that Defendant Odeh was ever directly advised of his rights by the Kenyan authorities.

16. Thereafter, AUSA [redacted] orally informed Defendant Odeh of his *Miranda* rights. Odeh was told that he had the right to remain silent and that invocation of the right to silence could not be used against him in court. He was also told that if he did speak to the American officials, statements that he made could be used against him. With respect to the right to counsel, AUSA [redacted] told Odeh that he was entitled to have an attorney present and to have an attorney appointed if he could not afford one. However, AUSA [redacted] informed Odeh that no American attorney was currently available to represent him in Kenya. AUSA [redacted] emphasized that Odeh was "the boss" with respect to answering questions without an attorney present.

17. AUSA [redacted] then advised Defendant Odeh that he had, essentially, three options:

(1) Odeh could decide that he did not wish to speak to either the Kenyans or the Americans and exercise his right to remain silent;

(2) Odeh could decide that he would only speak with an attorney present, in which case the American representatives would respect that choice and leave the room and he could decide whether to answer the Kenyan's questions; or

(3) he could decide to speak without having an attorney present to both the Kenyan and American authorities.

18. In response, Odeh asked about the possibility of speaking with the American officials outside the presence of the Kenyans. The American and Kenyan authorities took a break to discuss this possibility and left the room to inquire from the same CID official they had approached before. In the meantime, however, Odeh decided that he would speak to both the Kenyan and the American officials.

19. At that point, at 11:25 a.m. on August 15, 1998, Defendant Odeh signed the AOR. He never stated that he wished to hire an attorney. In fact, he asked the officials what would happen if he subsequently decided that he did not want to speak without a lawyer present. AUSA [redacted] informed him that he always had the right to stop

---

**9.** AUSA [redacted] stated that he is not sure that he was aware at the time that Odeh was arrested with approximately $560 on his person or that Odeh was a four year resident of Kenya and had family who resided in Kenya.

talking with the American officials. The interview on August 15, 1998 ended at 6:00 p.m.

20. At the beginning of his interrogation the next day, on August 16, 1998, Odeh asked to speak with the American officials alone and inquired about the status of some money that had been seized from him.

21. Later that day, in the context of explaining inconsistencies in his statements, Odeh noted that he was answering questions without an attorney. This was not a request for counsel, but merely an attempt to explain away his conflicting statements.

22. AUSA [redacted] again advised Odeh of his right to have an attorney and of the fact that no American attorney was currently available. Odeh was told that if he wanted to have an attorney present, the Americans would cease their interrogation. Odeh indicated that he wished to continue answering questions and did not ask for an attorney.

23. Interrogation of Defendant Odeh continued almost daily until he was transported to the United States on August 27, 1998. The interviews of Odeh were generally conducted between 9 a.m. and 6 p.m. AUSA [redacted] testified that a break was taken on August 19, 1998. Periodically, Odeh was reminded of his *Miranda* rights.

24. The interrogations were conducted at CID Headquarters in Room 109.

25. During his interrogation, Odeh admitted that he was a member of al Qaeda but denied any participation in (or foreknowledge of) the embassy bombings.

*Transport to the United States*

26. On August 25, 1998, the United States Attorney for the Southern District of New York decided to recommend that a warrant be obtained for Odeh's arrest. No warrant was issued at this time. Additional information regarding the circumstances leading up to the decision, by the American and Kenyan Governments, to try Odeh in the United States is included in classified Appendix A.

27. Because of concerns about a negative reaction on the part of the Kenyan public to the decision to try these defendants in the United States, the decision to prosecute Odeh in the United States was delayed to allow the Kenyans to gauge the public reaction to Al-'Owhali's transfer to the United States on August 26, 1998.

28. On August 27, 1998, Odeh was taken into American custody, placed in handcuffs, and transported to the United States. While on board an U.S. Air Force plane, several hours after departure from Kenya, Odeh was given standard *Miranda* warnings (in English and in Arabic) at 4:00 p.m.

29. Defendant Odeh arrived in the United States on August 28, 1998. He appeared that day before a United States magistrate judge in the Southern District of New York at 1:30 p.m.

*Conditions of Confinement*

30. Pakistani authorities held Odeh from August 7—August 14, 1998, at which time he was deported to Kenya.

31. Thereafter, Odeh was in incommunicado Kenyan custody from August 14—August 27, 1998. Under Kenyan law, individuals suspected of a capital offense may be held for fourteen days after arrest.

32. On August 18, 1998, Odeh was moved to the General Service Unit (GSU) Headquarters Detention Facility. GSU officials were given strict instructions that Odeh was not to see anyone unless authorized by the Director of the CID.

33. The Court finds that there were no threats or promises made to Defendant Odeh in exchange for the statements that he made.

34. While he was in Kenyan custody, Defendant Odeh's wife and brother-in-law were also detained and interviewed by the Kenyan CID.[10] Odeh was not permitted to speak with his wife or his brother-in-law.

### Characteristics of the Accused

35. Prior to his arrest in Pakistan, Defendant Odeh resided in Kenya for approximately four years. He is a Jordanian citizen. It appears that the American officials in Kenya believed Odeh to be a dual citizen of Jordan and Kenya.

36. Defendant Odeh spent three years at Far Eastern University in the Philippines were he studied architecture and engineering. Subsequently, Odeh spent several years in Afghanistan where he received military training and experience and where he served, for a time, as a medic.

37. Odeh's first language is Arabic, but he also speaks English.

38. The Defendant is married to a Kenyan woman, with whom he has two children. Many of her family members reside in Kenya.

### III. MOTION TO SUPPRESS STATEMENTS MADE IN KENYA: PRESENTMENT

■ Defendant Al-'Owhali seeks suppression of statements that he made to American and Kenyan authorities on the ground that the statements were obtained while he was "held in incommunicado custody in Kenya for two weeks without pres-

---

10. AUSA [redacted] testified the Odeh's wife had been placed in protective custody. He stated that he believed that Odeh's brother-in-law was arrested.

11. Defendant Odeh also makes presentment claims relating to his detention in Pakistan. The Court notes, as Odeh acknowledges

entment to a magistrate." (Al-'Owhali Post Hrg. Brief at 26.) He asserts that his extended detention in Kenya was a "purposeful delay" designed to extract a confession before he was brought in front of a federal magistrate. (*Id.* at 27.) Specifically, Al-'Owhali asserts that, despite the Government's claim that he was in Kenyan custody, he was de facto in American custody.

Similarly, Defendant Odeh claims that when he was transported from Pakistan to Kenya on August 15, 1998, he was delivered to the "joint custody of the American and Kenyan law enforcement agents." (Odeh Mot. at 27.) Therefore, he claims that his twelve-day detention in Kenya before being presented to an American magistrate on August 28, 1998, qualifies as an unreasonable delay and requires suppression of the statements that he made while he was in Kenyan custody.[11]

The Government denies these assertions, arguing that both Defendants were in Kenyan custody when they made the statements that are being challenged. Therefore, according to the Government, the United States officials who interrogated Odeh and Al-'Owhali in Kenya lacked the power to arrange for the Defendants to be brought before a magistrate until the Defendants were brought to the United States.

The Defendants' presentment claims are based on the provisions of Rule 5(a) of the Federal Rules of Criminal Procedure which require that:

> Except as otherwise provided in this rule, an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person with-

---

(Odeh Mot. at 27), that there is no suggestion that the Defendant was in American custody during his time in Pakistan. Thus, even if Odeh's Pakistan-based presentment challenge had not already (along with his other Pakistan claims) been denied as untimely, *see infra* Section V, it lacks merit.

out unnecessary delay before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041.

Violations of Rule 5(a) can result in the exclusion of statements that are obtained from a defendant prior to his or her presentment to a magistrate. *See McNabb v. United States,* 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1943) (explaining that suppression, although not constitutionally required, was motivated by "considerations of justice not limited to the strict canons of evidentiary relevance"); *Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (interpreting "without unnecessary delay" to mean that "the delay must not be of a nature to give opportunity for the extraction of a confession"). In light of these landmark decisions, the rule requiring prompt presentment of a defendant after arrest became known as the *McNabb–Mallory* rule.

In 1968 (two years after the Court decided *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), Congress enacted legislation to govern the admissibility of confessions that modified the *McNabb–Mallory* rule and constrained judicial discretion regarding the permissibility of an unnecessary delay. *See United States v. Yunis,* 859 F.2d 953, 967 (D.C.Cir.1988). Title II of the Omnibus Crime Control and Safe Streets Acts provides that:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

18 U.S.C. § 3501(c). The courts of appeals are divided as to the significance of the six-hour allowance that has come to be known as the "safe harbor" provision.[12] In *Perez,* the Second Circuit held that under 18 U.S.C. § 3501(c) "a delay of greater than six hours may by itself be grounds for suppression unless the delay is found to be reasonable." 733 F.2d at 1030. *But see United States v. Christopher,* 956 F.2d 536, 539 (6th Cir.1991). *Perez* explicitly states that district courts faced with pre-arraignment delays which exceed six hours must rule on the reasonableness of the delay. 733 F.2d at 1036.

Prior to undertaking a *McNabb–Mallory* or Section 3501(c) analysis, however, the Court must ascertain whether the Government was bound by these rules at the

---

**12.** *Compare United States v. Halbert,* 436 F.2d 1226, 1237 (9th Cir.1970) ("We conclude that confessions given more than six hours after arrest during a delay in arraignment are admissible if voluntary, although the trial judge under subsection 3501(b) may take into account delay in arraignment in his determination of voluntariness.") *with United States v. Perez,* 733 F.2d 1026, 1033, 1035 (2d Cir. 1984) (rejecting *Halbert* "insofar as it seems to require a finding of involuntariness in every case" and concluding that "section 3501 legislatively overruled the *McNabb–Mallory* rule only to the extent of (1) unreasonable pre-arraignment, pre-confession delays of less than six hours and (2) reasonable delays in excess of six hours.").

time that Odeh and Al-'Owhali made the statements at issue. The Supreme Court has established that Rule 5(a) does not apply until a defendant has been "arrested or detained for a federal crime." *United States v. Alvarez–Sanchez*, 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). However, the federal government's presentment obligation does not necessarily require that the defendant be in federal *custody*, but only that the defendant be detained (by whatever agency) on federal *charges*. *United States v. Fullwood*, 86 F.3d 27, 31 (2d Cir.1996) (finding that defendant who was held in state custody (on both state and federal charges) had, nonetheless, been arrested on a federal warrant and therefore should have been presented to a federal magistrate).

In this case, Al-'Owhali and Odeh were formally arrested by United States officials on August 26, 1998 and August 27, 1998, respectively. Both Defendants were, after allowing for reasonable travel time from Kenya following their arrests, presented before a United States Magistrate in the Southern District of New York without undue delay. Thus, there are only two possible bases upon which the Defendants can construct their presentment challenges.

First, the Defendants could allege that the situation was analogous to that presented in *Fullwood*. *See* 86 F.3d 27. In other words, they could argue that even though they were in Kenyan custody, they were being held on both Kenyan and American charges and should therefore have been brought before a magistrate. *See id.* at 31. The attempt to apply *Fullwood* in this manner fails because of the inherent and important differences between the relationship between federal and

state law enforcement agencies and the relationship that exists between sovereign nations.[13] If the Kenyans were holding Odeh and Al-'Owhali on Kenyan charges, then the Americans could not reasonably be expected to arrange presentment before a United States magistrate. *Cf. United States v. Chadwick*, 415 F.2d 167, 170 (10th Cir.1969) ("Courts have, however, generally recognized an exception to the applicability of Rule 5(a) to arrested persons in state custody for the simple reason that such persons cannot be conveniently arraigned while in state custody.").

The alternate means by which the Defendants could challenge the Government's failure to present them to a magistrate before their arrival in the United States is the "working arrangement" rule, which provides that federal officials may not collude with state officers to circumvent federal presentment requirements. *See Anderson v. United States*, 318 U.S. 350, 356, 63 S.Ct. 599, 87 L.Ed. 829 (1943) (holding that statements may be excluded even in a case where "federal officers themselves were not formally guilty of illegal conduct" if the evidence is "secured improperly through collaboration with state officers"). This doctrine has infrequently been applied to exclude evidence. *Cf. Alvarez–Sanchez*, 511 U.S. at 359, 114 S.Ct. 1599 (characterizing an *Anderson*-type case as a "presumably rare scenario"). The vitality of the rule after § 3501(c) has not been resolved by the Supreme Court, *see Alvarez–Sanchez*, 511 U.S. at 360, 114 S.Ct. 1599, but where an *Anderson* objection is raised, lower courts have continued to investigate the nature of cooperative relationships between federal and state or local authorities. *See, e.g.,*

---

**13.** There appear to be no cases in this circuit (or otherwise) which have addressed these questions in the international context. The Supreme Court precedent upon which *Fullwood* relies, *Alvarez–Sanchez*, states that "[i]f a person is arrested and held on a federal charge by 'any' law enforcement officer—*federal, state, or local*—that person is under 'arrest or other detention' for purposes of

§ 3501(c) and its '6–hour safe harbor period.'" 511 U.S. at 358, 114 S.Ct. 1599 (emphasis added). The *Alvarez–Sanchez* holding makes no reference to foreign law enforcement agencies. While many of the principles outlined in the cases reviewed here are roughly applicable to the circumstances presented by Odeh and Al-'Owhali, they are by no means a perfect fit.

*United States v. Anderson,* 1996 WL 572085, *9 (S.D.N.Y.). Although the Court has found no cases which discuss the application of the working arrangement analysis to cooperation between the United States Government and a foreign government, the purpose of the rule (to ensure that the federal government does not improperly conspire with other agencies to evade the requirements of Rule 5(a)) seems equally applicable in the international context.

The caselaw makes very clear that the Defendants bear the burden of establishing that Kenyan custody was improperly used to circumvent the rigors of Rule 5(a). *Alvarez–Sanchez,* 511 U.S. at 359, 114 S.Ct. 1599; *United States v. Frank,* 8 F.Supp.2d 284, 299 (S.D.N.Y.1998); *United States v. Carter,* 910 F.2d 1524 (7th Cir.1990). Mere suspicion of a collusive arrangement is insufficient. *United States v. Coppola,* 281 F.2d 340, 344 (2d Cir.1960), *aff'd per curiam,* 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961); *United States v. Gaines,* 555 F.2d 618, 622 (7th Cir.1977). To satisfy their burden, the Defendants must show that the Government made deliberate use of Kenyan custody to postpone their presentment requirements. *United States v. DeJesus,* 912 F.Supp. 129, 138 (E.D.Pa.1995) (finding no presentment concern in two-week delay during state custody because "there was no evidence of collusion between state and federal authorities to keep the defendant in state custody pending federal charges").

In part because courts are reluctant to discourage cooperation between agencies,[14] the mere fact of federal participation in an investigation does not suffice to establish an improper "working arrangement." *See United States v. Leeds,* 505 F.2d 161, 164

(10th Cir.1974); *Carter,* 910 F.2d at 1528. Likewise, the fact that representatives of the United States government interrogated Odeh and Al-'Owhali is not dispositive. *See Coppola,* 281 F.2d at 344 (explaining that FBI agents properly interrogated defendants who were in state custody because they had a "duty to endeavor to ascertain all the available facts about the federal crimes which they were investigating"). *See also Barnett v. U.S.,* 384 F.2d 848, 857 (5th Cir.1967); *Gaines,* 555 F.2d at 624. *Cf. Abel v. United States,* 362 U.S. 217, 229, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (finding FBI's participation (including conducting search) during execution of INS warrant did not "taint the administrative arrest"). In this case, it is clear that at least some of the American officials involved in the investigation were interested, early in the investigations of both Defendants, in prosecuting them in the United States. (Tr. Jan. 23, 2001 Suppression Hr'g at 197 (testimony of AUSA [redacted]).) For that reason, it appears that the Americans made efforts to comply with both Kenyan and American law during the bombing investigation. (*Id.* at 146–151.) Nevertheless, the Americans viewed themselves as the "guests" of the Kenyans. (*Id.* at 197.)

At the same time, the degree to which the interrogations of the Defendants were dominated by United States personnel—who appear to have asked the majority of the questions which were put to the Defendants—is certainly relevant. *See Coppola,* 281 F.2d at 341; *Frank,* 8 F.Supp.2d at 298 (discussing who "conducted and controlled" the investigation). The early and significant involvement of the Americans in the investigation of these Defendants makes this case a closer "working

---

**14.** *See Coppola,* 281 F.2d at 344 ("If there is to be effective law enforcement, it is to be expected that every police agency, be it state, county, city or federal, will cooperate and exchange information."); *Chadwick,* 415 F.2d at 171 ("In the very nature of interstate crime, cooperation between local and federal authorities is essential and desirable."). For

obvious reasons, in the face of crimes which are simultaneously committed in two countries, which are directed at the government of a third country, and which are committed by perpetrators who have fled to still other countries, cooperation between the various nations which are involved is essential to an effective investigation.

arrangement" call than many others. *See, e.g., Coppola,* 281 F.2d at 343 (finding no improper collaboration where the arrangements for the defendants' arrest and detention were "exclusively planned and executed by the Buffalo police without any suggestion or participation by the F.B.I."). To support his claim, Al-'Owhali highlights that during his "Kenyan custody," American officials also "controlled his removal and return to his prison cells." (Al-'Owhali Mot. at 23–24.) However, although the United States played an important role, the Court does not find that the American officials supplanted the Kenyans' authority in the manner that the working arrangement rule requires.

In fact, the Court is persuaded of the Kenyans' control of the investigation by several facts which evidence a departure from traditional FBI practices: the identification parade was conducted in conformity with Kenyan law and at the exclusive direction of Kenyan CID officials, Al-'Owhali was generally not handcuffed when transported and interrogated, and he was not fingerprinted until August 21, 1998. In addition, S.A. Gaudin testified that American agents did not conduct investigations independent of the Kenyan CID and that he believed that he lacked the authority to make arrests. When Al-'Owhali was arrested at Iftin Lodge by Kenyan officers, the American agents remained in the truck. And, as information outlined in the Classified Appendix makes very clear, when Odeh arrived in Kenya from Pakistan, he was arrested and taken into the exclusive custody of Kenyan CID officials.

On August 21, 1998, Al-'Owhali indicated to S.A. Gaudin and S.A. Bongardt that he would tell them the truth about his participation in the Kenya bombing if he would be tried in the United States. The agents, who did not know how to respond to Al-'Owhali's conditional offer, suspended the interview. Similarly, when the interview resumed on August 22, 1998, Al-'Owhali expressed dissatisfaction with AUSA [redacted]'s promise of "best efforts" and solicited a more firm guarantee that he would be taken to the United States. Again, the agents ceased asking questions of the Defendant, taking, this time, a two hour break while AUSA [redacted] sought an answer. The assertion that the Americans secretly controlled the whole investigation is significantly undermined by these two examples of restraint in the midst of a time-sensitive investigation. If the American officials had actually been in control of the investigation, then they would most likely have immediately guaranteed an American prosecution when Al-'Owhali requested such assurance, rather than delay the investigation overnight and postpone obtaining useful information from the Defendant. *See Anderson,* 1996 WL 572085, *9 (finding that "hours of negotiation" about defendant's release significantly weakened defendant's "working arrangement" claim). The Court accepts the Government's representation that, although various personnel certainly contemplated an American prosecution of the Defendants beforehand, the final decision to prosecute Odeh and Al-'Owhali in the United States was not made until sometime after a telephone call between United States Attorney Mary Jo White and Attorney General Janet Reno on August 25, 1998.

In some "working arrangement" cases, the context makes it clear that the federal government drove the investigation. *See Barnett,* 384 F.2d at 858 (5th Cir.1967); *United States v. Broadhead,* 413 F.2d 1351, 1358 (7th Cir.1969). That is simply not the case here. It cannot be reasonably suggested that the Kenyans lacked their own independent motive for pursuing the investigations of the Defendants. The Court finds that the Kenyan officials had an obvious investment in the investigation, given the magnitude of the impact that the Nairobi bombing had on the Kenyan community.

As AUSA [redacted] testified, the Kenyan and American authorities were en-

deavoring to solve the same crime and were anxious to evaluate what additional threats might still be pending. (Tr. Jan. 23, 2001 Suppression Hr'g at 198.) For that reason, the fact of their joint investigation is less indicative of collusion than it might have been in another context where there is no concern about future criminal behavior.

In some cases, courts have considered the existence of a present intent on the part of the body holding the defendant in custody to prosecute him for the charges on which he is held. *See Abel,* 362 U.S. at 230, 80 S.Ct. 683 (finding no collusion where persuaded that the INS's administrative warrant was "a bona fide preliminary step in a deportation proceeding"); *Anderson,* 1996 WL 572085, *9 (S.D.N.Y.); *United States v. Pugh,* 25 F.3d 669, 675 n. 4 (8th Cir.1994); *Boeckenhaupt v. U.S.,* 392 F.2d 24, 27 (4th Cir.1968); *Barnett,* 384 F.2d at 858. Prior to the retaliatory American missile strikes, a Kenyan murder prosecution appeared likely to the American officials present in Kenya. (Gov't Post–Hearing Memo. at 64.) But the missile strikes prompted significant reluctance on the part of the Kenyans to proceed with a bombing prosecution which might subject Kenya to Bin Laden reprisals. The fact that the Kenyans eventually elected to defer to the American prosecution does not establish the existence of an improper arrangement. *Alvarez–Sanchez* at 359, 114 S.Ct. 1599; *United States v. Rowe,* 92 F.3d 928, 932 (9th Cir.1996).

Finally, with respect to Odeh's case, much of the undue delay that he alleges actually followed the making of the statements at issue. *See DeJesus,* 912 F.Supp. at 138 ("While the state's continuing custody of the defendant without arraignment after he confessed certainly seems to have been undue, there is no logical way that the failure of federal or state authorities to arraign the defendant promptly after he confessed could have had any impact on the voluntariness of the confession, which occurred before the undue delay."). Odeh began making statements on August 15, 1998, the day after his arrival in Kenya from Pakistan. There is nothing in the facts outlined in this opinion (nor in those set forth in the classified appendix) that suggests that on that date the Americans and the Kenyans were complicit in any subterfuge to keep Odeh in Kenya as a means of securing a confession from him.

## IV. MOTION TO SUPPRESS STATEMENTS MADE IN KENYA: FIFTH AMENDMENT

■ Defendant Odeh seeks suppression on grounds that statements he made during custodial interrogation in Kenya were elicited by U.S. law enforcement in violation of his Fifth Amendment rights. Pertinent to this issue are the concurrent holdings we make in a separate sealed opinion of this date concerning the suppression motions of Defendants Al-'Owhali and K.K. Mohamed. In it, we rule that: (1) an unconnected, non-resident alien may properly invoke the Fifth Amendment as a basis for suppressing his own statements at a domestic criminal trial; (2) the *Miranda* warning/waiver framework should be used to determine the admissibility of statements made by a defendant during his overseas interrogation by U.S. agents, even if that defendant was then in the physical custody of foreign authorities; and (3) the FBI advice of rights form used in Kenya as part of the embassy bombing investigation was facially deficient because it prematurely foreclosed the possibility that counsel would in fact be allowed inside the foreign stationhouse. Given the above, our inquiry here begins with the additional *Miranda* admonitions given to Odeh orally by AUSA [redacted].

### A. CURING THE DEFICIENT AOR

■ The overriding question is this: Was Odeh ever told by American officials that he had the right to the assistance and presence of counsel for purposes of interrogation in Kenya? We find that he was. Questioning of Odeh began at approxi-

mately 10:00 a.m. on August 15, 1998. S.A. Anticev began the session by reading aloud (in English) the written AOR. At some point in the middle of the recitation, Odeh asked about the availability of a Kenyan lawyer. The context of that query led AUSA [redacted] to believe that Odeh was interested in appointed counsel. Once S.A. Anticev completed reading the AOR, all questioning ceased while AUSA [redacted] exited the interview room to inquire into the matter of appointed Kenyan counsel. He was told by a high-ranking CID officer that Kenyan law did not provide appointed counsel during the investigative stage. AUSA [redacted] immediately returned to the interview room and related that information to Odeh. It was also ascertained that, in fact, Odeh did not have counsel already retained.

AUSA [redacted] then re-apprised Odeh of his *Miranda* rights; this was done orally, from memory, and without reference to the written AOR. Odeh was told that he had the right to remain silent, that his silence could not be used against him in court, that anything he did say could be used against him, and that he had the right to have an attorney present. AUSA [redacted] also informed Odeh that no American attorney was currently available, but that he still had a choice as to whether he would answer questions without an attorney present. It was stressed that, for all intents and purposes, Odeh was the "boss" as to his participation in any American interrogation. To drive the point home, AUSA [redacted] specifically enumerated Odeh's options: (1) Odeh could decide that he did not wish to speak to either the Kenyans or Americans; (2) Odeh could decide that he would only speak with an attorney present, in which case the Americans would respect that choice and leave the room; and (3) Odeh could decide to speak to both the Kenyans and Americans without an attorney present.

AUSA [redacted]'s oral advice of rights cured the deficient AOR. The detailed and patient explanations given by AUSA [redacted] affirmatively communicated the message that, no matter what, Odeh possessed the right to insist on the assistance and presence of counsel for purposes of questioning by U.S. law enforcement. There was no indication that such a right only existed if Odeh was actually inside the United States. Admittedly, Odeh was told that neither an American nor a Kenyan appointed lawyer was currently available, but that information was simply the truth. *Miranda*, after all, is not served when police make misrepresentations. Moreover, what was perhaps available—a private Kenyan attorney—was never limited in any way. And by asking Odeh if he had Kenyan counsel already retained, AUSA [redacted] certainly alerted Odeh as to the existence of that possibility. We therefore conclude that Odeh was adequately apprised of his *Miranda* rights immediately after the administration of the written AOR and before any substantive questioning had yet taken place.

## B. WAIVER

■ We further find, by a preponderance of the evidence, that Odeh made a valid waiver of his *Miranda* rights. Counsel for Odeh seems to concede that Odeh was indeed aware of his right to counsel. (Memo. in Supp. of Odeh's Kenyan Suppression Mot. at 2 ("Mr. Odeh's understanding was that he was entitled to a lawyer.").) But even apart from this admission, the evidence is not to the contrary. Odeh told the Americans that he was comfortable speaking English and that he would ask clarifying questions if he did not understand his rights or anything else the agents said. At no time did Odeh indicate that he was experiencing comprehension problems during the interview sessions. Furthermore, AUSA [redacted] explained to Odeh his *Miranda* rights with a tremendous degree of conscientiousness, precision, and detail. Odeh himself asked AUSA [redacted] a number of follow-up questions concerning his rights, thereby

revealing Odeh's grasp of the salient issues. Because Odeh fully appreciated the fact that he was the "boss" as to whether he would accede to questioning by Americans, we find Odeh's waiver to be knowing and intelligent.

Viewing the totality of the circumstances, we additionally conclude that Odeh's waiver was voluntary. Odeh makes no claim that he was abused, mistreated, or threatened by either the Kenyans or Americans. He raises no complaint with respect to the objective conditions of his confinement. Nor does he allege that his personal characteristics made him unduly vulnerable. Instead, only two theories are raised. First, he was held in incommunicado detention for the duration of his stay in Kenya. Yet this cannot be said to have induced his statements since he began confessing from the very first day of questioning. Second, Odeh argues that he was unfairly told that the consequence of his request for counsel would be the departure of the Americans and his being left alone with the Kenyans. But this is precisely what *Miranda* requires: where no counsel is available, interrogation must cease. The "compulsion" experienced by Odeh, if any, was the product of his own internal wishes and not of any coercive conduct on the part of U.S. personnel. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Most importantly, the substance of Odeh's confession in Kenya reveals that he was driven to talk in order to distance himself from the embassy bombing. We hold that statements made by Odeh to U.S. law enforcement in Kenya are admissible.

### V. MOTION TO SUPPRESS STATEMENTS MADE IN PAKISTAN

■ We deny as untimely all aspects of Odeh's January 18, 2001 motion to suppress. That motion deals with statements Odeh made in Pakistan to Pakistani law enforcement and the evidentiary fruit thereof. While it is true that the Court never imposed a hard deadline by which Odeh was required to renew his withdrawn June 20, 2000 suppression motion,[15] Rule 12(b)(3) of the Federal Rules of Criminal Procedure mandates that all motions to suppress must be raised "prior to trial." We believe that the unique context of this case necessitates that the "prior to trial" language of Rule 12(b)(3) be interpreted as "prior to jury selection."

Jury selection commenced on January 3, 2001—two weeks before the filing of Odeh's Pakistan-related motion. Back in December 2000, preparations were already being made to accommodate the need in this case for a pre-strike pool of 80–plus veniremen, all of whom would have to be death-qualified and be able to serve on a 9–month trial. Between December 12 and 19, 1,302 citizens of this federal district were asked to complete a probing and exhaustive questionnaire containing 96 distinct questions. Only 424 individuals in this original pool of 1,302 were found to be without clear hardship (32.5 percent); they were thereafter summoned for individual voir dire beginning on January 3, 2001. By the close of business on January 16— after 9 full days of jury selection—the Court had engaged in the voir dire of 154 potential jurors and had selected 65 to be included in the final pool. Thus, by the time Odeh renewed his motion to suppress statements made in Pakistan, on January 18, jury selection in this case was over two-thirds complete.

At that particular point, had we granted a suppression hearing on Odeh's January 18 motion, such action would certainly have resulted in great inconvenience to the 65 potential jurors the Court had already selected and the 270 others who had yet to be subjected to individual voir dire. *Cf. United States v. Mauro*, 507 F.2d 802, 806 (2d Cir.1974) ("A motion in advance of trial avoids the serious personal inconvenience

**15.** See *supra* Part I of this Opinion for a detailed procedural history of this matter.

to jurors and witnesses which would result from interruptions and delay once the jury had been selected and the trial had commenced."), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975). The lives of these men and women would have been held in abeyance for a substantial duration, a particularly unfortunate uncertainty given the projected length of trial (9 months).[16] There also would have existed the risk that too long an interregnum would force the Court to cancel jury selection and start completely anew.[17] *Cf. id.* at 806 ("[T]he waste of prosecutorial and judicial resources occasioned by preparation for a trial could be avoided if a timely and successful motion were made in advance."). Furthermore, any ruling in favor of suppression would have left the Government with insufficient time to alter its theory of the case in this sprawling prosecution. *See United States v. Cassity,* 631 F.2d 461, 465 (6th Cir.1980) ("[A] pretrial decision whether the challenged evidence is admissible gives the Government the time and flexibility to change its theory of the case, to develop or place greater reliance upon untainted evidence or otherwise to modify its trial strategy in response to an adverse ruling."). All of this leads us to conclude that, in a case such as this, the timeliness goals of Rule 12(b)(3) are more effectively served when the deadline for the filing of suppression motions occurs at the onset of jury selection, rather than the swearing-in of a jury. *See United States v. Allied Stevedoring Corp.,* 241 F.2d 925, 932 (2d Cir.) ("The motion to suppress evidence ... was delayed ... till 40 jurors had been assembled, and the prosecution was about to open. Rule 41(e)

[the predecessor to Rule 12(b)(3) ] ... puts the grant of such a hearing in the discretion of the judge unless made 'before trial' and here if the trial had not literally begun, the hearing would have delayed it, and the occasion was within the purpose of the limitation."), *cert. denied,* 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957); *see also United States v. Echols,* 577 F.2d 308, 311 (5th Cir.1978) (deeming suppression argument as untimely because raised "just six days before trial"), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1288, 59 L.Ed.2d 499 (1979).

Despite the untimeliness of Odeh's January 18, 2001 motion to suppress, relief from waiver exists "for cause shown." Fed.R.Crim.P. 12(f). Odeh offers, however, no valid reasons for his late submission. First, counsel for Odeh has been aware of the legal grounds for this suppression motion since at least as far back as June of last year. Second, the Court's January 9 opinion (since withdrawn) granting Al-'Owhali's suppression motion did not affect the merits of Odeh's substantive claims relating to his interrogation by Pakistani law enforcement. And third, the mere fact that Odeh changed his mind as to his willingness to file a sworn affidavit is insufficient cause to ameliorate untimeliness. *See United States v. Nunez,* 19 F.3d 719 (1st Cir.1994) ("[I]t would make Rules 12(b)(3) and (f) meaningless were an unexplained change of mind on the part of the defendant deemed 'cause' for relief from waiver, following jury empanelment, under a rule fundamental to orderly pretrial procedure."); *United States v. Gonzales,* 749 F.2d 1329, 1336 (9th Cir.1984) ("Although

16. After all, discovery would have to be exchanged, motion papers would have to be submitted, and a full evidentiary hearing would have to be held. Also problematic would have been the burden on the Government to locate, prepare, and fly to the United States relevant witnesses from Pakistan, the situs of Odeh's interrogation.

This is in marked contrast to the reopened Al-'Owhali suppression hearing, which did in fact take place in the middle of jury selection.

The supplementation of evidence by means of a reopened hearing requires the investment of significantly less time and resources; indeed, it only took 1 day to complete.

17. This would have been particularly wasteful in light of the fact that the scope of jury selection in the instant prosecution was the largest ever in the Southern District of New York—twice the size of the next comparable case.

the court in its discretion may 'for cause shown' grant relief from … waiver, it was not an abuse of discretion to deny the motion when the only 'cause shown' was appellant's belated decision to change trial tactics.")

Odeh submits just the following one-sentence explanation: "After discussing the court's opinion of January 9, 2001 with my attorneys, I am convinced that these limited issues can be raised without running afoul of my deeply held religious beliefs." (Odeh Aff. in Support of Mot. to Suppress Pakistani Statements ¶ 10.) Yet given the great lengths previously taken by Odeh to withdraw his sworn affidavit when it was filed in conjunction with his original June 20, 2000 suppression motion—for reasons he then claimed were also based on religion (*see* Tr. Aug. 1, 2000 Sealed, Ex Parte Hr'g)—the Court remains less than persuaded by the above cursory justification. This is especially so when we consider that Odeh's June 20, 2000 motion and his January 18, 2001 motion are virtually identical. Nevertheless, whether or not courts may sometimes relieve waiver in circumstances relating to a defendant's religious beliefs, we find no occasion with respect to the present situation that warrants discretionary relief under Rule 12(f).[18] The Court denies as untimely Odeh's January 18, 2001 motion to suppress statements made in Pakistan and the fruits thereof.[19]

### VI. Motion to Suppress Statements Made in Kenya: Vienna Convention

Defendant Odeh seeks suppression of his statements because he was not informed of his right to consular notification under the Vienna Convention. In an opinion which is being issued concurrently with this opinion, the Court rejects Defendant Al-'Owhali's claim that an alleged violation of the Vienna Convention required suppression of his statements to Kenyan and American officials. For the reasons outlined in that opinion, the Court likewise denies this aspect of Defendant Odeh's claim.

### VII. Conclusion

For the foregoing reasons, Defendant Odeh's motions to suppress evidence are denied. Likewise, Defendant Al-'Owhali's motion to suppress his statements based on an alleged delay in presentment is also denied.

SO ORDERED

---

**18.** Our conclusion is reinforced by the fact that the Government does not even intend on using, in its case-in-chief, any statement made by Odeh during interrogation by Pakistani law enforcement.

**19.** Admittedly, we did permit Odeh to proceed on his motion to suppress statements made in Kenya, even though such motion was made in the midst of jury selection. That specific motion, however, raised facts and issues intertwined with Al-'Owhali's reopened suppression hearing. Consolidating both motions into a single hearing was a practical and sensible solution that imposed minimal burdens on the parties and the Court.