UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed," a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed

Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7) 98 CR. 1023 LBS.

United States District Court,
S.D. New York.

Aug. 24, 2001.

Mary Jo White, United States Attorney for the Southern District of New York, New York, New York, Patrick J. Fitzgerald, Kenneth M. Karas, Paul W. Butler, Assistant United States Attorneys, Allan P. Haber, New York, New York, for Defendant Salim.

Frederick H. Cohn, David Preston Baugh, Laura Gasiorowski, New York, New York, for Defendant Al-'Owhali.

David A. Ruhnke, David Stern, New York, New York, for Defendant Khalfan Khamis Mohamed.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York, New York, for Defendant El Hage.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, New York, New York, for Defendant Odeh.

*OPINION*

SAND, District Judge.

The Seventh Superseding Indictment in this case alleges that Mamdouh Mahmud Salim is a high-ranking participant in a global terrorist conspiracy that seeks, inter alia, to kill United States nationals and destroy United States property.[1] Presently before the Court is a motion by Salim to suppress all custodial statements he gave in Germany during interrogation by German and United States law enforcement officials. For the reasons set forth below, Salim's motion to suppress is denied in its entirety.

## I. PROCEDURAL HISTORY

Salim filed the instant motion to suppress on June 14, 2000. The Government submitted its opposition on August 28, 2000, and Salim replied on September 6, 2000. An evidentiary hearing was held on October 18–20, 2000, during which five witnesses and the Defendant testified.[2] Post-

---

1. Specifically, the Indictment alleges that Defendant Salim violated 18 U.S.C. § 2332(b) (conspiring, while outside the United States, to kill U.S. nationals), § 1117 (conspiracy to murder), § 844(n) (conspiracy to destroy, by means of fire or explosive, buildings and property of the United States), and § 2155(b) (conspiracy to attack national defense utilities).

2. Originally scheduled to begin on September 12, 2000, the evidentiary hearing was adjourned in order to accommodate Government and Defense witnesses traveling to New York from Germany.

The October 18–20, 2000 proceedings were themselves conducted in the shadow of the troubled relationship between Salim and his appointed attorneys at the time–Paul J. McAllister, Charles D. Adler, and George Goltzer. On September 23, 2000, Salim began a flurry of unilateral letters to the Court in which he expressed great dissatisfaction with counsel and, in particular, their strategic decisions concerning the approaching suppression hearing. Salim made several alternative requests for immediate relief: substitution of new appointed counsel, adjournment of the evidentiary hearing, and withdrawal of the suppression motion without prejudice to renewal. Salim further declared in these letters that he would no longer cooperate with his lawyers, nor would he seek personally to attend the evidentiary hearing if it went forward as scheduled on October 18.

At a sealed ex parte proceeding held on October 2, 2000, and again in two sealed orders issued on October 10 and 16, the Court found all of Salim's complaints regarding his attorneys to be without merit. But despite this Court's final disposition of the matter, Salim repeatedly disrupted the evidentiary hearing to voice his continued objections to counsel and to contest the legitimacy of the ongoing proceedings. Salim's obstinacy was further punctuated by his frequent insistence that he be permitted to cross examine Government witnesses on his own, and by extended periods in court during which Salim in-

hearing briefs from both parties were received by the Court on November 3, 2000.

A separate series of events involving Salim unfolded beginning on November 1, 2000, an effect of which was to delay until recently the Court's ability to rule on Salim's pending suppression motion. On that date, a federal corrections officer at the Metropolitan Corrections Center (the "MCC") was gravely injured in a violent attack allegedly perpetrated by Salim and Khalfan Khamis Mohamed, another defendant in this case. Two of Salim's three appointed attorneys at the time of the suppression proceedings—Paul J. McAllister and Charles D. Adler—had been in the middle of a client visit with Salim at the very moment of the attack.[3]

Four days later, the Government informed the Court that it intended immediately to pursue independent criminal charges against Salim with respect to the MCC attack, and that Messrs. McAllister and Adler would almost certainly be called as Government witnesses at that separate trial. A clear conflict of interest thus arose wherein Messrs. McAllister and Adler were to represent Salim in the terrorism conspiracy case before this Court, while at the same time they might be required to testify against Salim in a con-

current prosecution. Accordingly, at a sealed hearing on November 8, 2000, the Court relieved Messrs. McAllister and Adler of their duties,[4] and ultimately Allan P. Haber—who remains Salim's counsel to date—was assigned in their place. And because new counsel would not be ready for trial on the terrorism conspiracy charges by January 2001, the Court additionally acted to sever the trial of Salim from that of the four other defendants in this case.[5]

To afford Attorney Haber an opportunity to become familiar with his client and the voluminous discovery materials, and in light of the Court's February 16, 2001 rulings concerning the suppression motions of the other defendants in this case,[6] the Court sought new briefing on Salim's still-pending motion to suppress. Salim thus submitted a Supplemental Memorandum of Law on May 7, 2001, to which the Government responded on June 29, 2001. The motion became fully submitted upon the Court's receipt of Salim's reply papers on July 20, 2001.

## II. FINDINGS OF FACT

At the suppression hearing, the Court heard the testimony of the following six witnesses: (a) three law enforcement offi-

---

serted wads of cotton into his ears, closed his eyes, and laid his head down atop counsels' table. Ultimately, Salim's erratic behavior during the suppression hearing culminated in his decision, against the reasoned advice of counsel, to testify in his own defense.

3. The third of Salim's appointed counsel at the time of the suppression proceedings, George Goltzer, was not present at the MCC that day.

4. Attorney Goltzer, because he is a member of the same law firm as Attorney Adler, was also relieved from further representation of Salim.

5. Those four defendants—Wadih El Hage, Mohamed Sadeek Odeh, Mohamed Rashed Daoud Al-'Owhali, and Khalfan Khamis Mo-

hamed—were tried before this Court from January 3 to May 29, 2001. The jury returned a verdict of guilt on all counts as to all four defendants.

Salim's trial for his alleged role in the MCC attack is currently scheduled to proceed before Judge Deborah A. Batts beginning the week of September 17, 2001. The date of Salim's trial on the terrorism conspiracy charges in this case has yet to be determined.

6. *United States v. Bin Laden,* 132 F.Supp.2d 168 (S.D.N.Y. Feb.16, 2001); *United States v. Bin Laden,* 132 F.Supp.2d 198 (S.D.N.Y. Feb.16, 2001).

cials who participated in Salim's interrogation in Germany—FBI Special Agent ("S.A.") Richard S. Karniewicz, and Inspectors Rupert Folger and Ursula Franzke of Germany's Bavarian Criminal Investigation Department (the "BLKA"); (b) the German–Arabic interpreter who provided translation services during all of Salim's interview sessions–Dr. Khaled Atallah; (c) the prison chaplain who counseled Salim during his detention in Germany–Father Menzell Rainer; and (d) the Defendant Salim himself. The Court additionally bases its findings of fact on the BLKA's contemporaneous and detailed transcripts of the interrogation proceedings.[7]

### The Arrest

1. On September 14, 1998, in the Southern District of New York, a criminal complaint was filed against and an arrest warrant issued for Defendant Salim.[8] At that time, because there was reason to believe that Salim was physically present in Munich, Germany, a request was made by the United States to German authorities for the immediate arrest and extradition of Salim.

2. S.A. Karniewicz of the New York-based FBI Joint Terrorism Task Force and Kenneth M. Karas, an Assistant United States Attorney ("AUSA") in the Southern District of New York, arrived in Munich on September 16, 1998 in order to aid in Salim's capture. Hours after their arrival, they learned that Salim had in fact already been arrested by German law enforcement that very same day.

3. The German authorities' arrest and subsequent investigation into Salim was led by Inspectors Folger and Franzke of the BLKA. Matters commonly within the investigatory jurisdiction of the BLKA include terrorism, illegal explosives, narcotics, and organized crime. At the outset, the BLKA regarded and treated Salim as a suspected terrorist who, alone or with others, might have already committed domestic violations of German criminal law.

4. At approximately 4 p.m. on September 16, 1998, Salim was arrested by the BLKA as he arrived at a car dealership situated near the Munich International Airport. Salim was taken into custody and transported forthwith to a police station located inside the airport. No questioning of Salim occurred during this period.

5. En route from the car dealership to the airport, Inspector Folger acted on his own initiative to search the apartment where Salim had been staying while in the Munich area.

6. S.A. Karniewicz and AUSA Karas were joined in Germany by FBI Special Agent Richard F. Tamplin, Assistant Legal Attache assigned to the United States Embassy in Bonn. These three individuals comprised the entirety of the American contingent involved in Salim's arrest and interrogation in Germany, and all three were present at the airport police station by the time that Salim and the BLKA inspectors arrived from the car dealership.

---

7. During Salim's detention in Germany, he reviewed and edited the BLKA's daily transcripts of his interrogation sessions. Though the transcripts were printed in German, Dr. Atallah translated them into Arabic for Salim.

8. Salim was not indicted in the Southern District of New York until January 1999.

7. At the airport police station, Salim's luggage and personal belongings were searched by both the BLKA and the three American officials.

8. After some initial processing but still without any questioning, Salim was transported to BLKA headquarters in Munich. All interviews of Salim by law enforcement were to be conducted at that site.

*The September 16 Session and the German Advice of Rights*

9. The first interview of Salim commenced immediately upon his arrival at BLKA headquarters; the session lasted from 9:30 p.m. on September 16 until 12:30 a.m. on September 17.

10. For the first two hours, Inspectors Folger and Franzke conducted the interview with no Americans present.

11. The BLKA inspectors always posed their questions to Salim in German. Dr. Atallah–a freelance interpreter with special professional experience in German criminal matters–provided German–Arabic translation services at all times. There were no complaints of communication difficulties with Dr. Atallah, and the Court has no reason to believe that Dr. Atallah executed his interpretive duties with anything less than the utmost competence and accuracy.

12. The BLKA inspectors began the interview by informing Salim that he had been arrested pursuant to an American warrant, that the Americans sought his extradition to the United States, and that he had been charged in an American criminal complaint with conspiracy to murder U.S. citizens [9] and conspiracy to use weapons of mass destruction.[10]

13. Salim was then presented with a German-language document containing Germany's standard Advice of Rights ("AOR"), which Dr. Atallah orally translated into Arabic for Salim (a task Dr. Atallah had done hundreds of times before). The German AOR, as translated into English, states as follows:

I was informed of what I am charged with.

I was told that the law allows me either to respond to the charge or to remain silent; to consult at any time, even before the interrogation takes place, with legal counsel of my choice; and that I have the right to ask for separate hearings of evidence in my defense. I was also informed that I am obliged to give complete and truthful answers to questions about my first and last name, my name at birth, birthday, place of birth, marital status, occupation, place of residence, and nationality. Any violation of this obligation will result in a fine ...

14. Salim stated that he understood his rights as enumerated and that, although he would not then physically sign the German AOR, he would still make statements in order to demonstrate that he was not the "Salim" named in the American charges. No request for counsel was made and no promises were given by the BLKA inspectors in return for Salim's cooperation.

15. Subsequently, Inspectors Folger and Franzke briefly inquired into

---

**9.** 18 U.S.C. § 2332(b).

**10.** 18 U.S.C. § 2332a(a). Ultimately, the Seventh Superseding Indictment did not charge Salim with this offense.

Salim's background and his purpose for being in Germany. Salim was given a half-hour break from 10:45 p.m. to 11:13 p.m. in order to pray and eat.

*The September 16 Session and the American Advice of Rights*

16. ˆ After the break, S.A. Karniewicz, S.A. Tamplin, and AUSA Karas were allowed to interview Salim. American questioning of Salim was only conducted in the physical presence of the BLKA.

17. The Americans first introduced themselves and asked Salim whether he was comfortable proceeding in English. Salim answered that he was and as a result, all conversations thereafter between American law enforcement and Salim took place wholly in English, though Dr. Atallah provided Arabic clarification as needed.[11]

18. Salim was advised of the criminal charges against him and that the American officials now sought an opportunity to ask Salim questions. S.A. Karniewicz then provided Salim with an English-language form purporting to describe Salim's rights under American law:

We are representatives of the United States Government. Under our laws, you have certain rights. Before we ask you any questions, we want to be sure that you understand those rights.

You do not have to speak to us or answer any questions. Even if you have already spoken to the German authorities, you do not have to speak to us now.

If you do speak with us, anything that you say may be used against you in a court in the United States or elsewhere.

In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.

Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.

If you decide to speak with us now, without a lawyer present, you will still have the right to stop answering questions at any time.

You should also understand that if you decide not to speak with us, that fact cannot be used as evidence against you in a court in the United States.

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

19. This AOR is identical to ones already found by the Court to be facially insufficient. *See United States v. Bin Laden*, 132 F.Supp.2d 168 (S.D.N.Y. Feb.16, 2001); *United States v. Bin Laden*, 132 F.Supp.2d 198 (S.D.N.Y. Feb.16, 2001).

20. S.A. Karniewicz read the AOR aloud in English, pausing at the end of each sentence to confirm

11. In fact, Salim later informed the Americans that his five-year course of study in electrical engineering at the University of Baghdad had been conducted entirely in English.

Salim's understanding. During the reading, Salim took notes in Arabic on a blank sheet of paper.

21. As an additional measure, the Americans decided to also administer the AOR in Salim's native language of Arabic. The following procedure was used: S.A. Tamplin orally translated the entire AOR into German, which Dr. Atallah then orally translated into Arabic. Salim followed along by making a checkmark next to each relevant statement on the English-language form he had before him.

22. Salim stated that he understood his rights, that he consented to the Americans' presence, and that he welcomed answering their questions. As before, no request for counsel was ever made.

23. But Salim did ask to postpone continuation of the interview until the next morning since he was tired and still hungry from the day's events. That request was immediately honored by the authorities.

24. Prior to the session's conclusion, Salim inquired into the benefits, if any, he stood to gain from cooperation with the United States government. AUSA Karas informed Salim that he did not have the authority to make any promises, and that any decision along those lines could only come from his superiors and would still ultimately have to be approved by a judge. There was never any suggestion to Salim that his cooperation in Germany would preclude his extradition to the United States.

25. Salim was transported to Munich Stadelheim Prison where he would be housed during his detention in Germany. That evening, he was permitted to take the American AOR form (which he had not yet signed) away with him for further study.

*The September 17 Morning Session*

26. Beginning at 11:05 a.m. on September 17, 1998, the three American officials interviewed Salim in the presence of the BLKA inspectors for approximately ninety minutes.

27. The BLKA inspectors, through Dr. Atallah, re-apprised Salim of his rights under German law–despite the fact that only the Americans would be asking any questions of Salim during that session. Indeed, this procedure was repeated by the Germans at the start of each interview day with Salim while he was in their custody. At each instance Salim stated that he understood, and at each instance he agreed to speak without a lawyer present.

28. Also that morning, S.A. Tamplin and S.A. Karniewicz re-read and re-explained the American AOR to Salim, though this time only in English. Salim again took notes while being advised of his rights therein. Salim stated that he was fully aware of his rights and consented to sign the waiver at the bottom of the American AOR form. At no time during questioning that morning did he request counsel or complain of mistreatment by the custodial authorities.

*German Extradition Proceeding*

29. The September 17 morning session was interrupted at 11:30 a.m. in order to produce Salim before the examining magistrate judge of the Munich District Court. The pur-

pose of the proceeding was to verify the warrant for Salim's arrest and formally to begin the extradition process.

30. Only Inspector Folger and Dr. Atallah (who provided translation services) accompanied Salim to the court proceeding. No Americans were present.

31. While there, the German court asked Salim whether he sought to make any statements before the court with respect to extradition. Salim stated that he would do so only in the presence of an attorney.

32. The German court proceeding concluded without any statement from Salim, who was then returned to BLKA headquarters.

33. The Americans were not informed of Salim's refusal to make courtroom statements until the afternoon of the following day.

### The September 17 Afternoon Session

34. Upon returning to BLKA headquarters after the German court proceeding, Inspector Folger asked Salim whether he wished to continue the interview sessions without an attorney. Salim answered in the affirmative.

35. When the Americans arrived to commence the September 17 afternoon session at approximately 3:20 p.m., they asked Salim if was still willing to answer their questions. He stated that he was and the session continued until approximately 6:35 p.m. Breaks were afforded for food; drinks were provided during the course of the interview.

36. At no time during the afternoon session did Salim ask the authorities to discontinue questioning. He made no complaints concerning his custodial treatment nor did he at any time request the assistance or presence of counsel.

### The September 18 Session and Departure of the Americans

37. On September 18, 1998, Salim was interviewed from 10:36 a.m. to 2:15 p.m.

38. Only the BLKA inspectors were present for the first ninety minutes. They began the session, as was routine, with Dr. Atallah translating into Arabic the German AOR. Inquiries were again made as to Salim's purpose for being in Germany, as well as his business and personal contacts therein.

39. A prayer break was given from 11:45 a.m. until noon, after which the Americans joined in the interview. Salim was asked if he wished to continue speaking with the Americans, he consented, and the session proceeded with only the Americans asking questions until a second break that began at 2:15 p.m.

40. During that second break, the Americans were notified for the first time of Salim's refusal to make statements before the German court. This prompted the Americans, in an over-abundance of caution, to cease all further communications with Salim, thereby effectively ending that day's interview session.

41. At this same time, a letter written in English from Salim to the American law enforcement officials was delivered to S.A. Karniewicz. The two-page letter was comprised entirely of claims of innocence by Salim and included efforts by him to

distance himself from Bin Laden's terrorist activities.

42. Throughout the September 18 session, Salim never once complained of his custodial treatment, nor did he ever request the assistance of an attorney.

### Continued German Interrogation

43. The BLKA inspectors continued questioning Salim on their own after the Americans had departed. Interview sessions were held on September 21, 23, 24, 25, and 28.

44. Acting at their own initiative, the BLKA focused on Salim's actions and contacts in Germany. Indeed, Salim had admitted at the September 16 session to being in Germany on at least eight different occasions.

45. Salim voluntarily participated in these continued interviews, insisting repeatedly to the German authorities that he was thereby demonstrating his innocence. Not once did Salim request the assistance or presence of counsel.

## III. ANALYSIS

Extensive briefing on this motion has successfully narrowed the matters in dispute to two straightforward questions of law. First, was the facially defective American AOR nonetheless cured to the satisfaction of *Miranda* and its progeny? Second, did Salim invoke his Fifth Amendment right to counsel when he refused to make any statements before the German court without the presence of an attorney?

We resolve both of these questions in favor of the Government and accordingly deny Salim's motion to suppress.

### A. Advice of Rights

This Court has previously ruled that the constitutional touchstone for admitting against a defendant his own custodial statements is the same whether American law enforcement agents interrogate the defendant domestically or abroad, whether American agents interrogate the defendant while he is technically in American versus foreign custody, and whether the defendant is a United States citizen or instead a non-resident alien with no voluntary connection to this country. *See United States v. Bin Laden*, 132 F.Supp.2d 168 (S.D.N.Y. Feb.16, 2001); *United States v. Bin Laden*, 132 F.Supp.2d 198 (S.D.N.Y. Feb.16, 2001). As such, Salim's custodial statements in Germany to the Americans will be admissible against Salim only if the Government has shown that Salim was adequately apprised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996), thereby rendering his subsequent waiver of those rights knowing and intelligent.[12]

In this case, the American agents administered to Salim an overseas AOR that this Court has already found facially inadequate as a matter of law. *See Bin Laden*, 132 F.Supp.2d at 189–192. We found the American AOR problematic insofar as it suggests to a suspect that he only has the right to the presence and assistance of counsel during interrogations physically conducted on American soil.

---

**12.** The Court reiterates that the *Miranda* warning/waiver framework applies to the evaluation of overseas interrogation conducted by American law enforcement agents only. *See United States v. Welch*, 455 F.2d 211, 213 (2d Cir.1972). Salim's attempt to include within *Miranda's* ambit interrogations independently conducted by foreign authorities is contrary to existing law and is in no way suggested by any of the previous suppression rulings in this case.

At the same time, however, this Court also found that a facially flawed overseas AOR by the Americans can still be cured if foreign custodial authorities contemporaneously provide the suspect with an accurate apprisal of his rights to counsel under foreign law. *See id.* at 194. Here, the BLKA inspectors began each and every interview day in Germany by correctly informing Salim that "the law allows [him] ... to consult at any time, even before the interrogation takes place, with legal counsel of [his] choice...." (Gov't Exh. 2, Translation) And because the German AOR was administered to Salim even at interviews in which only the American agents interposed questions, the clear message was that Salim's right to counsel existed in Germany and that it would be honored at any time he sought to exercise it, irrespective of who actively conducted the particular session. The Court thus concludes that the facial inadequacy of the American AOR was entirely remedied by the BLKA inspectors' contemporaneous and repeated recital to Salim of the standard German AOR.

### B. *German Extradition Proceeding*

Salim additionally contends that the Supreme Court's decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), requires suppression in this case because most of Salim's interrogation by American and German law enforcement occurred after he had already sought the "assistance of counsel" at an earlier German court proceeding.[13] *Edwards* held that a suspect who has invoked his Fifth Amendment right to have counsel present during interrogation cannot later be subject to further questioning by the

authorities–regarding any subject matter–until counsel has been made available to him, or unless the accused himself initiates further communication with the police. Although it is undisputed that Salim did refuse to make statements before the German court in the absence of an attorney, we conclude that Salim sought counsel only for the narrow purpose of battling extradition before that court.

■■■ To begin, the right to counsel under the Fifth Amendment is no greater than the right to have the assistance and presence of counsel during custodial interrogation. *See Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996). The law is equally clear that not every request for counsel by a defendant is tantamount to an exercise by that defendant of his right to counsel under the Fifth Amendment. *See McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The test to determine if the Fifth Amendment has in fact been invoked–and thus that *Edwards* applies–is whether the defendant made "some statement that can reasonably be construed to be an expression of a desire for the assistance of any attorney *in dealing with custodial interrogation by police.*" *Id.* at 178, 111 S.Ct. 2204 (emphasis in original). In other words, the core inquiry is whether Salim's action before the German court constituted a "desire to deal with the police only through counsel" (*Edwards,* 451 U.S. at 484, 101 S.Ct. 1880)or whether it was instead a more limited decision by Salim to participate in formalized court proceedings concerning extradition only with assistance from a local German attorney.

---

**13.** Salim assumes that the *Edwards* rule, once successfully triggered, would apply to proscribe the interrogational conduct of foreign police. Because we ultimately conclude that Salim never even invoked his Fifth Amend-

ment right to counsel before the German court (thus rendering *Edwards* inapplicable), we need not address the validity of the above assumption.

A review of the factual record undisputedly supports the more limited interpretation of Salim's "request for counsel." First, Salim was repeatedly apprised of his right to have counsel present during questioning by law enforcement, and in each such instance–both before and after the extradition proceeding–Salim without hesitation declined to exercise that right. Second, Salim consistently and adamantly declared to the interviewing agents that he wished to answer all their questions in order to demonstrate his innocence. Third, when informed that one of his German extradition attorneys was en route to be present at the September 25, 1998 interrogation, Salim opted to begin the session without waiting for the attorney's arrival. (Gov't Exh. 3502–P–T at 2) Fourth, despite being directly advised on September 28, 1998 by another of his German extradition attorneys that he should invoke his right to silence if questioned by law enforcement without counsel present, Salim nonetheless insisted that he would continue making statements in order to "clear up some points." (Gov't Exh. 3502–Q–T at 1)

It is thus this Court's conclusion that Salim was on the one hand comfortable speaking informally with the American and German agents without at attorney present, but that he preferred on the other hand to handle his formal contestation of extradition only with the help of experienced German counsel. This reading of the facts is not at all inconsistent since, as the Supreme Court has recognized, "suspects often believe they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions." *McNeil,* 501 U.S. at 178, 111 S.Ct. 2204. And in Salim's own mind, there may very well have existed a significant distinction between his need for counsel when participating in a voluntary dialogue with police in order to extinguish their suspicions, versus any such need for counsel when navigating German judicial procedure in order to avoid extradition. Because Salim never made a clear expression "for the particular sort of lawyerly assistance that is the subject of *Miranda,"*–i.e., to deal with the police only through an attorney-his request for counsel before the German court cannot be considered an invocation of his Fifth Amendment right. *Id.* Therefore, the *Edwards* rule was not triggered and law enforcement authorities were free to continue interviewing Salim even after the extradition proceeding.

## IV. CONCLUSION

For all of the foregoing reasons, Defendant Salim's motion to suppress is denied in its entirety.

SO ORDERED.